[998 NE2d 1056, 976 NYS2d 432]

The People of the State of New York, Respondent, v James Alcide, Appellant.

Argued September 3, 2013; decided October 10, 2013

## POINTS OF COUNSEL

*Lynn W.L. Fahey, Appellate Advocates*, New York City (*Melissa S. Horlick* of counsel), for appellant. The court denied appellant's due process rights to a jury trial and a fair trial by (a)

personally assuming the prosecutor's role during readbacks of the direct testimony of two prosecution witnesses, and then switching roles with the court reporter to read those witnesses' cross-examination answers; and (b) failing to first advise counsel of its intended, unorthodox readback procedure before addressing the jury. (*People v O'Rama*, 78 NY2d 270; *People v Arnold*, 98 NY2d 63; *People v Yut Wai Tom*, 53 NY2d 44; *People v Jamison*, 47 NY2d 882; *People v Moulton*, 43 NY2d 944; *People v Mees*, 47 NY2d 997; *Thom v Jaymee Fashions*, 35 AD2d 946, 29 NY2d 534; *People v Kovzelove*, 242 AD2d 477, 91 NY2d 875; *People v De Jesus*, 42 NY2d 519; *People v McLaughlin*, 150 NY 365.)

*Charles J. Hynes, District Attorney*, Brooklyn (*Leonard Joblove* and *Keith Dolan* of counsel), for respondent. Defendant has failed to preserve his claims that the trial court erred by participating in the readback of testimony and that the court did not give adequate notice of its intended response to the readback requests. (*People v Becoats*, 17 NY3d 643; *People v Kelly*, 5 NY3d 116; *People v Mezon*, 80 NY2d 155; *People v Robinson*, 88 NY2d 1001; *People v Gray*, 86 NY2d 10; *People v Whalen*, 59 NY2d 273; *People v Rodriguez*, 100 NY2d 30; *People v Yut Wai Tom*, 53 NY2d 44; *People v Agramonte*, 87 NY2d 765; *People v Patterson*, 39 NY2d 288.)

## OPINION OF THE COURT

READ, J.

Defendant James Alcide was indicted for second-degree murder (Penal Law § 125.25 [1]) and second- and third-degree weapon possession (Penal Law §§ 265.03 [2]; 265.02 [4]) in connection with a shooting on February 20, 2005. The victim, recently released from prison, had driven a female friend on an errand to pick up clothes at a Brooklyn laundromat late in the afternoon of that day, expecting to meet up with his girlfriend there; she had begun a relationship with defendant while the victim was incarcerated. After the victim spoke briefly with his girlfriend, he turned away and walked into a nearby small grocery store.

A bystander sitting in a car parked on the same side of the street as the grocery store was startled by a shot. When he looked in the direction of the sound, the bystander saw a man firing a gun into the store; he identified defendant as the shooter in a lineup and, later, in court. The victim's friend, who was standing next to the victim's car about 40 feet away from the

store, waiting for him to return, also heard gun shots and saw defendant, whom she knew, sprinting out of the store with a gun in hand. The friend ran into the store where the victim was lying on the floor, grievously wounded. He spoke defendant's name to her before losing consciousness. At that point, as a crowd was forming outside and the police were arriving, the friend saw the victim's girlfriend and screamed "All this is your fault, you know. This is your fault."

In summation, defense counsel principally attacked the reliability of the testimony of the bystander and the victim's friend, the prosecution's two key witnesses. He claimed that the bystander was farther away from the grocery store than he estimated and had an obstructed view of the shooter in crepuscular light, making his eyewitness identification of defendant suspect; and that the friend, who had been convicted of various fraud-related offenses, gave testimony that was incredible (e.g., the victim's dying declaration), or, with respect to numerous factual matters (e.g., the time of the shooting, the color of the gun, the victim's height), inconsistent with other trial evidence. He also contended that the crime scene outside the store, where the police recovered a shell casing and a live cartridge, had been compromised by the crowd of onlookers.

During deliberations, the jury sent notes to the judge to request readbacks of the testimony of both the bystander and the first police officer to arrive at the crime scene. At trial, this officer testified that on February 20, 2005, she and her partner were working patrol when they were notified via radio that a male had been assaulted; they drove the five or six blocks to the location of the reported assault, which was the grocery store; she observed a crowd outside the store and a shell casing on the sidewalk once the crowd of 20 or 30 onlookers was pushed back; she found the victim lying on the floor inside the store; he was "mumbling, but unconscious" and unable to answer when asked if he had been shot; and the ambulance arrived about two or three minutes later and took the victim to the hospital.

The police officer also described how the crime scene outside the store was cleared of onlookers and secured, and testified that when she arrived, she saw a woman (the victim's girlfriend, as it turned out) "arguing with another individual" in front of the store. At the direction of her supervisor, the officer placed this woman, who denied having seen anything and "didn't really want to talk," in a patrol car for transport to the precinct. The officer and her partner were then detailed to the hospital,

where she was assigned to stay outside the operating room. While waiting there a "couple of hours," she learned the victim's identity and, later, was informed that he had been pronounced dead. The officer identified the victim's body at the morgue the next morning.

In the presence of defendant, counsel and the jury, the judge stated that he had received "notes requesting the reading of the testimony of the first officer at the crime scene. That will be Court Exhibit 3. And the reading of [the bystander's] testimony, which will be Court Exhibit 4." He then advised the jurors that

> "[t]o expedite [the readbacks], and hopefully to keep you awake, what we will do on the direct, I will read the questions, the court [reporter] will read the witness's response, and we'll reverse that on cross-examination, with the reporter reading the questions and I'll be reading the response of the witnesses."

Neither party objected to this procedure for handling the readbacks.

The jury ultimately convicted defendant of intentional murder and the top weapon possession count. On December 12, 2006, the judge sentenced him to concurrent terms of imprisonment of 18 years to life and nine years, respectively, for these crimes. Defendant appealed, arguing that the trial judge committed mode of proceedings errors by departing from the protocol for handling jury notes set out in *People v O'Rama* (78 NY2d 270 [1991]), and by taking part in the readbacks.

On May 1, 2012, the Appellate Division affirmed the judgment of conviction and sentence (95 AD3d 897 [2d Dept 2012]), concluding that defendant's unpreserved claims did not implicate *O'Rama* or otherwise constitute mode of proceedings errors, and declined to reach them in the interest of justice. Citing *People v Starling* (85 NY2d 509 [1995]), the court noted that "the jury merely requested read-backs of certain trial testimony" (95 AD3d at 898). A Judge of this Court granted defendant permission to appeal (19 NY3d 956 [2012]), and we now affirm.

## I.

Section 310.30 of the Criminal Procedure Law "imposes two separate duties on the court following a substantive juror inquiry: the duty to notify counsel and the duty to respond"

(*O'Rama*, 78 NY2d at 276).[1] Indeed, "the trial court's core responsibility under the statute is both to give meaningful notice to counsel of the specific content of the jurors' request—in order to ensure counsel's opportunity to frame intelligent suggestions for the fairest and least prejudicial response—and to provide a meaningful response to the jury" (*People v Kisoon*, 8 NY3d 129, 134 [2007]). A court's failure to supply a meaningful notice or response constitutes error affecting the mode of proceedings, and therefore presents a question of law for appellate review even in the absence of timely objection (*see O'Rama*, 78 NY2d at 279; CPL 470.05 [2]).

A trial judge generally fulfills this core responsibility by following the procedure endorsed in *O'Rama*, which requires submission of a jury inquiry to the trial judge in writing, after which the judge marks the written inquiry as a court exhibit; reads it into the record in counsel's presence and before the jury is recalled to the courtroom; allows counsel an opportunity to suggest responses to the inquiry; informs counsel of his intended instruction; and, once the jury returns, reads the inquiry aloud before responding (*see O'Rama*, 78 NY2d at 277-278 [adopting the procedure outlined in *United States v Ronder*, 639 F2d 931, 934 (2d Cir 1981)]; *see also Kisoon*, 8 NY3d at 134). We have, however, cautioned that the point of our decision in *O'Rama* is "not to mandate adherence to a rigid set of procedures, but rather to delineate a set of guidelines calculated to maximize participation by counsel at a time when counsel's input is most meaningful, *i.e., before the court gives its formal response*" (*O'Rama*, 78 NY2d at 278 [emphasis added]; *see also Kisoon*, 8 NY3d at 135; *People v Lykes*, 81 NY2d 767, 769 [1993] [the trial judge did not commit *O'Rama* error by asking the jury, unbeknownst to the defendant, his counsel and the prosecutor, to clarify its note since the judge read the clarification into the record before reinstructing the jury with respect to the crimes charged, and defense counsel did not object to either

---

1. Section 310.30 states that

"[a]t any time during its deliberation, the jury may request the court for further instruction or information with respect to the law, with respect to the content or substance of any trial evidence, or with respect to any other matter pertinent to the jury's consideration of the case. Upon such a request, the court must direct that the jury be returned to the courtroom and, after notice to both the people and counsel for the defendant, and in the presence of the defendant, must give such requested information or instruction as the court deems proper."

the charge or the procedure employed by the court]). The touchstone is whether the way in which the judge chooses to handle a jury inquiry affords meaningful notice to counsel and a meaningful response to the jury (*see O'Rama*, 78 NY2d at 278; *see also Lykes*, 81 NY2d at 769 ["Section 310.30 does not require notice to defendant in every instance of communication from the jury to the court"]).

In *O'Rama*, the trial judge did not show a juror's note to the defendant and his attorney, or read it aloud in open court before responding. Instead, he summarized the note's "substance" for the jury and the parties before addressing the juror's inquiry by administering an *Allen* charge for a second time (*see Allen v United States*, 164 US 492 [1896]). At that point, defense counsel unsuccessfully sought the note's disclosure. We held that by neglecting to make a verbatim account of the juror's communication available to the defendant's attorney, the court deprived him of meaningful notice in violation of CPL 310.30, "thus represent[ing] a significant departure from the organization of the court or the mode of proceedings prescribed by law [and] . . . present[ing] a question of law [for our review] . . . , notwithstanding that defense counsel did not object to the court's procedure until after the supplementary charge had been given" (*O'Rama*, 78 NY2d at 279 [internal quotation marks and citations omitted]).

The defendant in *Starling* likewise challenged the procedure followed by the trial judge in responding to jury notes, claiming *O'Rama* error. The two notes in dispute requested a rereading of the definition of intent. We concluded that the judge afforded meaningful notice, pointing out that

> "[b]ecause the court read the entire content of the jury's notes in open court prior to responding, this case is distinguishable from the situation presented in [*O'Rama*], where the trial court withheld from counsel the contents of a juror's note, thereby depriving defendant of the opportunity to participate in formulating the court's response . . . By contrast, here, defense counsel was given notice of the contents of the jury notes and had knowledge of the substance of the court's intended response—a verbatim rereading of the intent charge previously given on several occasions. Accordingly, counsel's silence at a time when any error by the court could have been obviated by timely objection renders the

claim unpreserved and unreviewable here" (*Starling*, 85 NY2d at 516 [citations omitted]).

*Starling* controls this case. As in *Starling* (and *Lykes*) and unlike *O'Rama*, the two jury notes—requests for readbacks of two witnesses' testimony—were disclosed in their entirety in open court before the trial judge responded to them. And the judge explained exactly how he was going to conduct the readbacks. If defense counsel considered the judge's intended approach prejudicial, he certainly had an opportunity to ask him to alter course, and it behooved him to do so (*see People v Ramirez*, 15 NY3d 824 [2010] [where defense counsel had notice of the contents of the jury's note and the court's intended response yet failed to object at a time when the error could have been cured, the defendant's claim of error was unpreserved]).

## II.

Defendant also contends that, regardless of whether the trial judge provided meaningful notice within the meaning of *O'Rama*, his participation in the readback constituted a mode of proceedings error. Defendant complains, in particular, that the judge's announced approach was "patently uneven" because he "readily assum[ed] the prosecution's role" by reading the questions posed by the prosecutor to the bystander and the police officer, which were designed to elicit testimony favorable to the People, and then reading their answers on cross-examination, where they gave testimony adverse to defense counsel's theory of the case (i.e., that the bystander misidentified defendant as the shooter and the crowd of onlookers outside the grocery store "hindered" the police investigation). In short, defendant does not claim that the readback was selective; rather, he disagrees with how the judge participated in it as a reader.

The Second Department in *People v Brockett* (74 AD3d 1218 [2d Dept 2010]), a case remitted for a new trial because of a charging error, stated in dictum that the trial judge "should not have participated as a reader when the jury asked for a readback of testimony," warning that "[w]hen, during a read-back of testimony, a trial judge assumes the role of a witness or inquiring counsel, he or she may unwittingly and erroneously convey to [the] jury that the court is aligned with the party or counsel whose role the court has assumed in the read-back" (*id.* at 1221; *see also People v Facey*, 104 AD3d 788, 789 [2d Dept 2013] [while repeating *Brockett*'s admonition, the court concluded that any error in the particular case "was harmless,

and under the circumstances . . . did not deprive the defendant of a fair trial"]).[2] The Second Department cited only *People v De Jesus* (42 NY2d 519 [1977]) in support of its advice in *Brockett*.

The trial judge in *De Jesus*, a case featuring "sharp issues of credibility," berated and denigrated defense counsel in front of the jury, characterizing him as "unworthy of respect and attention" (*id.* at 524). Under these circumstances, we concluded that the defendant was "unfairly burdened . . . with the obligation, not only of rebutting the proof of the People, but also of countering the implications imputed by the court[ ] [such that] the error [could not] be disregarded as harmless" (*id.*).

The trial judge's aggressive behavior toward the defense attorney in *De Jesus* created a situation far different from anything alleged to have happened here—i.e., that the judge inadvertently conveyed sympathy for the People's case by the mere fact that he read the questions put by the prosecutor to the People's witnesses on direct examination, and these witnesses' answers to the defense attorney's questions during cross-examination. Still, we agree with the Second Department that, as a general matter, a trial judge should shun engaging in readbacks of testimony. In the usual case, it is easy enough for a judge to assign this task to non-judicial court personnel and thereby avoid any risk of creating a misperception in the minds of the jurors.

█ In a case where a trial judge nonetheless elects to participate in a readback (certainly, nothing in CPL 310.30 prohibits it), any error is not of the mode of proceedings variety. "Not every procedural misstep in a criminal case is a mode of proceedings error"; rather, this narrow exception to the preservation rule is "reserved for the most fundamental flaws," such as shifting the burden of proof from prosecution to the defense, or delegating a trial judge's function to a law secretary (*see People v Becoats*, 17 NY3d 643, 651 [2011]).

While defendant argues that objection would have been futile in this case, nothing in the record suggests that the trial judge was so wedded to taking part in the readbacks that he could not have been dissuaded by timely protest. His stated reasons for participating were simply to move matters along and make what were going to be lengthy readbacks easier for the jury to follow by supplying two readers, one to voice questions posed; another, answers given.

---

**2.** *Brockett* and *Facey* were handed down several years after the trial in this case was completed.

Defendant also contends that requiring preservation would be unfair here because defense counsel's objection would have "telegraph[ed] to the jury that counsel believed the judge would be conveying his personal belief in the prosecution." But there is always a danger that, by objecting, a trial attorney will draw the jury's attention to something unfavorable to his client, or give the appearance of being argumentative or attempting to conceal evidence. Nonetheless, counsel in a criminal trial is responsible for bringing error to the court's attention "at a time when [it] . . . could have been obviated" (*Starling*, 85 NY2d at 516). And, of course, defense counsel always could have objected and asked to approach the bench to discuss the matter at sidebar, out of the jury's hearing.

Accordingly, the order of the Appellate Division should be affirmed.

Chief Judge LIPPMAN and Judges GRAFFEO, SMITH, PIGOTT, RIVERA and ABDUS-SALAAM concur.

Order affirmed.